**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

ORCHARD, HILTZ & MCCLIMENT, INC.,

        Plaintiff,

v.

PHOENIX INSURANCE COMPANY and
FEDERATED MUTUAL INSURANCE
COMPANY,

        Defendants.

_____/

CASE NO. 2:14-cv-11902

HON. MARIANNE O. BATTANI

**OPINION AND ORDER GRANTING DEFENDANT PHOENIX INSURANCE
COMPANY'S MOTION FOR SUMMARY JUDGMENT (Doc. 33), DENYING
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AGAINST PHOENIX
INSURANCE COMPANY (Doc. 31), GRANTING DEFENDANT FEDERATED
MUTUAL INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT (Doc.
30), and DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AGAINST
FEDERATED MUTUAL INSURANCE COMPANY (Doc. 32)**

## I.    INTRODUCTION

This matter is before the Court on two sets of cross motions for summary judgment.

Plaintiff Orchard, Hiltz & McCliment, Inc., seeks summary judgment against Defendant

Phoenix Insurance Company (Doc. 31) and against Defendant Federated Mutual

Insurance Company (Doc. 32).  Likewise, Defendant Phoenix has submitted a motion

for summary judgment (Doc. 33), and Defendant Federated has filed a motion for

summary judgment (Doc. 30).  The facts underlying this case involve Orchard Hiltz's

work as a project engineer designing upgrades to a wastewater treatment plant.  During

the course of the project, two subcontractors' employees were injured and killed as a

result of an explosion on the jobsite.  Orchard Hiltz, named as a defendant in two

underlying tort actions proceeding in Washtenaw County Circuit Court, initiated the

present declaratory action seeking a judgment that both Defendant insurance companies owe it a duty to defend and indemnify in the underlying actions.  The parties dispute whether Orchard Hiltz is covered as an additional insured under the Defendants' respective insurance policies and endorsements and whether the exclusions for professional engineering services apply.  For the following reasons, the Court **GRANTS** Phoenix Insurance Company's Motion for Summary Judgment; **DENIES** Orchard Hiltz's Motion for Summary Judgment against Phoenix Insurance Company; **GRANTS** Federated Mutual Insurance Company's Motion for Summary Judgment; and **DENIES** Orchard Hiltz's Motion for Summary Judgment against Federated Mutual Insurance Company.

## II.    STATEMENT OF FACTS

Plaintiff Orchard, Hiltz & McCliment, Inc., ("OHM") was retained by the Village of Dexter as the project engineer to design upgrades to Dexter's wastewater treatment plant ("WWTP"), specifically, its sludge handling system.  (Doc. 33, Ex. 4.)  OHM's responsibilities as project engineer included preparing a proposed design for the job, preparing construction drawings, contract documents, and specifications for the bidding of the project, and providing an on-site project engineer to oversee and supervise observation of the general contractor's activities during the construction phase, as well as coordinate the contractor's activities with the daily operations of the WWTP in order to minimize delays.  (Doc. 33, Exs. 4, 5, 6.)

The Village of Dexter hired nonparty A.Z. Shmina, Inc., ("Shmina") as the general contractor for the project.  (Doc. 33, Ex. 3.)  The contract between Dexter and Shmina (the "Prime Contract") identified OHM as the project engineer, and Section 00 80 00 of

the agreement required that Shmina purchase and maintain liability insurance

throughout the term of the project.  (Id.)  Specifically, the provision at issue stated:

> Prior to commencement of work, the CONTRACTOR shall purchase and maintain during the term of the project such insurance as will protect him, the OWNER(s), and Orchard Hiltz & McCliment, Inc., Consulting Engineers, from claims arising out of the work described in this Contract and performed by the CONTRACTOR, subcontractor(s) or sub-subcontractor(s) . . . .

(Id.)  Shmina obtained a commercial general liability insurance policy through Defendant

Phoenix Insurance Company ("Phoenix").  (Doc. 33, Ex. 9, Bates No. 00058.)  This

policy (the "Phoenix Policy") contains a Blanket Additional Insured Endorsement

extending coverage as follows:

> 1.   WHO IS AN INSURED – (Section II) is amended to include any person or organization that you agree in a "written contract requiring insurance" to include as an additional insured on this Coverage Part, but:
> a)   Only with respect to liability for "bodily injury", "property damage" or "personal injury"; and
> b)   If, and only to the extent that, the injury or damage is caused by acts or omissions of you or your subcontractor in the performance of "your work" to which the "written contract requiring insurance" applies.  The person or organization does not qualify as an additional insured with respect to the independent acts or omissions of such person or organization.

(Id.)  The endorsement also contains an exclusion to coverage for liability for bodily

injury, property damage, or personal injury "arising out of the rendering of, or failure to

render, any professional architectural, engineering or surveying services," such as

supervisory, inspection architectural, or engineering activities.  (Id.)

Part of the overall project plan designed by OHM involved work on two sludge-

processing digester tanks at the WWTP and required the removal and replacement of

the tanks' covers.  (Doc. 30, Ex. 3 at 65:23-66:5.)  Shmina, however, directed the

3

manner in which that stage of the job would be carried out.  (Doc, 30, Ex. 3 at 65:23-66:24.)  Shmina subcontracted with Platinum Mechanical, Inc., ("Platinum") to provide all labor and materials on the digester cover installation work.  (Doc. 32, Ex. 5.)  Platinum, in turn, contracted with Regal Rigging & Demolition ("Regal") to remove the covers from the digesters, as well as to provide concrete and steel grid demolition work.  (Doc. 32, Ex. 9.)  The subcontract between Shmina and Platinum (the "Platinum Subcontract") required Platinum to purchase and maintain a commercial general liability insurance policy to protect itself and to endorse that policy "to add A.Z. Shmina. Inc.[,] the Owner, and any additional parties as required by the Prime Contract Document, as additional insured[s], on a primary and non-contributory basis, with respect to the performance of [Platinum's] operations under this Subcontract Agreement and the Contract Documents."  (Doc. 32, Ex. 5 at Exhibit E.)  Exhibit A to the Platinum Subcontract incorporated by reference various other documents, including Section 00 80 00 of the Prime Contract.  (Doc. 32, Ex. 5.)  Accordingly, Platinum obtained a commercial general liability insurance policy through Defendant Federated Mutual Insurance Company ("Federated").  (Doc. 32, Ex. 1.)  The terms of this policy (the "Federated Policy") are very similar to the terms of the Phoenix Policy.  The Federated Policy contains an Additional Insured Endorsement extending coverage as follows:

> Section II – Who Is An Insured is amended to include as an additional insured any person or organization, other than a joint venture, for whom you are performing operations when you and such person or organization have agreed in writing in a contract or agreement that such person or organization be added as an additional insured on your policy.  Such person or organization is an additional insured only with respect to liability for "bodily injury", "property damage", or "personal and advertising injury" caused, in whole or in part, by:
>
> 1.      Your acts or omissions; or

4

      2.     The acts or omissions of those acting on your behalf;

in the performance of your ongoing operations for the additional insured.

(Id.)  The endorsement also contains the following limitation excluding coverage for:

> Any person or organization whose profession, business or occupation is that of an architect, surveyor or engineer with respect to liability arising out of the preparation or approval of or the failure in preparation or approval of maps, shop drawings, opinions, reports, surveys . . . or the performance of any other professional services by such person or organization.

(Id.)

The incident forming the basis of the underlying tort actions (the "underlying actions") took place on April 22, 2013.  Michael Koch, employed by Platinum as a pipefitter, was killed, and David McBride, employed by Regal as a laborer, was seriously injured when McBride used a torch to remove the digester tank covers, which ignited the methane gas inside the tanks and caused an explosion.  At the time of the explosion, OHM engineer Chris Nastally was present on the site making observations. The Estate of Michael Koch brought a wrongful death suit, and David McBride filed a bodily injury suit, both of which are currently pending in Washtenaw County Circuit Court.  The complaints allege negligence and gross negligence on the parts of OHM and the various other contractors in the performance of their respective duties on the WWTP project.  The complaints aver that OHM breached its duty as the project engineer by failing to ensure that the general contractor and subcontractors complied with all engineering plans and specifications and implemented all safety precautions, as well as by failing to require implementation of methane detection devices and other precautions.  More specifically, the complaints allege facts such as, "Rather than stop this dangerous cutting in the presence of methane gas, John Franklin from Shmina and

Chris Nastally from Defendant OHM provided McBride with plywood in an attempt to prevent sparks from the cutting torch [from] igniting the methane gas."  (Doc. 33, Ex. 8 at ¶ 100.)  Further, the complaints state that "Michael Koch was not informed by anyone, including Chris Nastally of Defendant OHM that the digester still contained explosive methane gas on that date, and had not been purged."  (Id. at ¶ 104.)

In the present action – although it is being defended in the underlying actions by its own professional liability carrier, XL Insurance Company – OHM seeks a declaration that it is entitled to defense and indemnification in the underlying actions pursuant to the additional insured endorsements contained in the Phoenix and Federated Policies.

## III.    STANDARD OF REVIEW

Summary judgment is appropriately rendered "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  Redding v. St. Eward, 241 F.3d 530, 532 (6th Cir. 2001). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  State Farm Fire & Cas. Co. v. McGowan, 421 F.3d 433, 436 (6th Cir. 2005) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)).  The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Where the movant establishes the lack of a genuine issue of material fact, the burden of demonstrating the existence of such an issue shifts to the non-moving party

to come forward with "specific facts showing that there is a genuine issue for trial."

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). That is, the party opposing a

motion for summary judgment must make an affirmative showing with proper evidence

and must "designate specific facts in affidavits, depositions, or other factual material

showing 'evidence on which the jury could reasonably find for the plaintiff.'" Brown v.

Scott, 329 F. Supp. 2d 905, 910 (6th Cir. 2004). In order to fulfill this burden, the non-

moving party need only demonstrate the minimal standard that a jury could ostensibly

find in his favor. Anderson, 477 U.S. at 248; McLean v. 988011 Ontario, Ltd., 224 F.3d

797, 800 (6th Cir. 2000). However, mere allegations or denials in the non-movant's

pleadings will not satisfy this burden, nor will a mere scintilla of evidence supporting the

non-moving party. Anderson, 477 U.S. at 248, 251.

## IV.    DISCUSSION

### A. The Phoenix Policy

When analyzing the scope of insurance policy coverage, the traditional principles

of contract and insurance law apply. Radenbaugh v. Farm Bureau Gen. Ins. Co., 240

Mich. App. 134, 138 (Mich. Ct. App. 2000). The construction and interpretation of an

insurance contract is a question of law for a court to determine. Henderson v. State

Farm Fire & Cas. Co., 460 Mich. 348, 353 (Mich. 1999). A court must discern the

parties' intent by reading the policy as a whole and giving effect to all terms according to

their ordinary and plain meaning. Radenbaugh, 240 Mich. App. at 138. Any

ambiguities will be construed against the insurer and in favor of the insured. Id. A court

must first consider whether coverage exists and then whether an exclusion precludes

coverage. Allstate Ins. Co. v. Freeman, 432 Mich. 656, 668 (Mich. 1989). It is the

insured's burden to establish that his claim falls within the terms of the policy.  Heniser v. Frankenmuth Mut. Ins., 449 Mich. 155, 172 (Mich. 1995).  Conversely, it is the insurer's burden to prove that an exclusion to coverage is applicable.  Arco Indus. Corp. v. Am. Motorists Ins. Co., 448 Mich. 395, 424-425 (Mich. 1995) (Boyle, J., concurring).  Although exclusionary clauses are strictly construed in favor of the insured, "[c]lear and specific exclusions must be given effect."  Auto-Owners Ins. Co. v. Churchman, 440 Mich. 560, 567 (Mich. 1992)

An insurance company's duty to provide a defense for its insured is broader than its duty to indemnify.  Freeman, 432 Mich. at 662.  The duty to defend "extends to allegations which '*even arguably* come within the policy coverage.'"  Detroit Edison Co. v. Mich. Mut. Ins. Co., 102 Mich. App. 136, 142 (Mich. Ct. App. 1980).  If there is doubt as to whether coverage extends to the allegations set forth in a complaint, all uncertainty must be resolved in favor of the insured.  Id.  Further, "an insurer has a duty to defend, despite theories of liability asserted against any insured which are not covered under the policy, if there are any theories of recovery that fall within the policy."  Radenbaugh, 240 Mich. App. at 137.  The duties to defend and indemnify depend on the allegations contained in the underlying complaint, which are not to be strictly interpreted.  Freeman, 432 Mich. at 662.  Rather, "it is necessary to focus on the basis for the injury and not the nomenclature of the underlying claim in order to determine whether coverage exists."  Ill. Employers Ins. of Wasau v. Dragovich, 139 Mich. App. 502, 507 (Mich. Ct. App. 1984).

### 1.  Vicarious Liability & Independent Acts

Pursuant to the Blanket Additional Insured Endorsement in the Phoenix Policy, a person or organization qualifies as an insured if the following factors are met: (1) the named insured agrees in a "written contract requiring insurance" to include that person or organization as an additional insured; (2) the potential liability derives from bodily injury, property damage, or personal injury; and (3) the injury or damage is allegedly caused by acts or omissions of the named insured or its subcontractor and not by the independent acts or omissions of the person or organization.  Here, the parties do not contest that the first two factors are met.  First, Shmina, the named insured of the Phoenix Policy, agreed in a written contract to provide commercial liability insurance protecting OHM from claims arising from its work.  (Doc. 33, Ex. 3, Section 00 80 00.) Second, the underlying actions involve claims for bodily injury.  The dispute regarding OHM's status as an additional insured centers on whether the claims set forth against OHM in the underlying actions were allegedly caused by the acts or omissions of Shmina or one of its subcontractors or whether the claims allege independent acts or omissions by OHM.  The limiting policy language specifically states that a person or organization is an additional insured only if:

> [T]he injury or damage is caused by acts or omissions of you or your subcontractor in the performance of "your work" to which the "written contract requiring insurance" applies.  The person or organization does not qualify as an additional insured with respect to the independent acts or omissions of such person or organization.

"Your work" is defined rather circularly by the policy as "[w]ork or operations performed by you or on your behalf."  (Doc. 33, Ex. 9, Bates No. 00035.)

Phoenix contends that this type of limiting clause insulates a contractor only from vicarious liability for injuries or damages arising out of a subcontractor's work.  As

interpreted by Phoenix, the claims asserted against OHM in the underlying actions are premised on OHM's direct liability for its own actions – accordingly, Phoenix urges the Court to find that coverage is unavailable.  Indeed, Phoenix has cited to a number of cases interpreting the same policy language at issue here as offering coverage only for claims of vicarious liability.  See, e.g., Shannon v. B.L. England Generating Station, No. 10-04524, 2013 U.S. Dist. LEXIS 168715 at *31 (D.N.J. Nov. 27, 2013); United Constr. Ent. Co. of St. Louis, Inc. v. Am. Contractors Ins. Group, Inc., No. 10-cv-81-WDS, 2011 U.S. Dist. LEXIS 34443 at *12-13 (S.D. Ill. March 31, 2011); St. Paul Fire & Marine Ins. Co. v. Hardin Constr. Group, Inc., 187 F. Supp. 2d 584, 590 (E.D.N.C. 2000).  On the other hand, OHM has directed the Court to a number of cases that have determined similar or identical language not to limit coverage to instances of vicarious liability.  See, e.g., Marathon Ashland Pipe Line LLC v. Md. Cas. Co., 243 F.3d 1232, 1240, n.5 (10th Cir. 2001); Thunder Basin Coal Co., L.L.C. v. Zurich Am. Ins. Co., No. 4:12CV231 CDP, 2013 U.S. Dist. LEXIS 173779 at *7 (E.D. Mo. Dec. 9, 2013); Peterson v. Discover Prop. & Cas. Ins. Co., 460 S.W.3d 393, 408 (Ct. App. Mo. 2015).

No courts within the State of Michigan or the Sixth Circuit have had the opportunity to settle whether these types of additional insured clauses are limited only to instances of vicarious liability.  One of the cases cited by Phoenix in favor of a vicarious liability limitation reasoned that such an interpretation was necessary in order to give meaning to the policy language.  Hardin, 187 F. Supp. 2d at 590.  Another case interprets the plain meaning of the clause to incorporate a vicarious liability limitation.  See B.L. England, 2013 U.S. Dist. LEXIS 168715 at *31.  In contrast, the cases cited by OHM that repudiate reading this limitation into the policy language reason that:

10

> [T]he policy language is not so clear that it limits coverage solely to
> vicarious liability.  Ambiguous policies are construed liberally in favor of
> the insured and strictly against the insurer.  The policy's ambiguity is
> compounded by the ease with which a drafter could have explicitly
> restricted coverage to vicarious liability.  When reading the policy as a
> whole, I conclude that the plain language unambiguously does not limit
> coverage to situations involving vicarious liability.

Thunder Basin, 2013 U.S. Dist. LEXIS 173779 at *7.  Likewise, although the policy

language involved is not identical, a Tenth Circuit decision noted that the majority

approach among circuits is not to read a vicarious liability limitation into a similar

provision.  See Marathon Ashland, 243 F.3d at 1240 (collecting cases).  While none of

these cases is binding, the Court finds the rationale applied in Thunder Basin to be most

persuasive.  The Court agrees that had Phoenix wished to limit coverage to cases

involving vicarious liability, it could have easily drafted a more explicit restriction in its

policy.  As it stands, the plain language is not clearly limited to such circumstances.

Having determined that the endorsement is not limited to instances of vicarious

liability, the Court's analysis must begin with an examination of the precise policy

language.  The endorsement here requires that the injuries or damage be "caused by"

the acts or omissions of Shmina or its subcontractors.  Since "caused by" is not defined

within the Phoenix Policy, the Court consults the dictionary definition to discern the plain

meaning of the term.  See Holland v. Trinity Health Care Corp., 287 Mich. App. 524,

527-28 (Mich. Ct. App. 2010) ("Courts may consult dictionary definitions to ascertain the

plain and ordinary meaning of terms undefined in an agreement.")  "Cause" is defined in

its noun form as "[s]omething that produces an effect or result."  Black's Law Dictionary

(8th ed. 2004).  As observed in Peterson, there is no hint from the policy language that

the Court must make a pre-determination of fault or negligence in order to ascertain

whether the injuries alleged in the underlying actions were "caused by" Shmina or its subcontractors.  See 460 S.W.3d at 406.  Therefore, in order to avoid an interpretation where coverage is contingent upon liability, the Court must ascertain what entities the underlying complaints *allege* to be the cause in fact or "but-for" causes of the injuries. See id.

The underlying complaints allege negligence against both OHM and Shmina for many, if not most, of the same breaches.  For example, the McBride complaint alleges that both companies breached their duties of care by "failing to ensure that reasonable steps within [their] supervisory and coordinating authority are taken to guard against readily observable, avoidable dangers in common work areas," and by "failing to observe whether reasonable safety precautions were being exercised where Defendants OHM, A.Z. SHMINA and PLATINUM had an unusually high degree of control over the Project."  (Doc. 33, Ex. 7 at ¶ 23a-b and ¶ 53a-b.)  The complaints also allege actions undertaken separately by OHM and Shmina employees, such as Shmina supervisor John Franklin's failure to inform Michael Koch that the digester still contained explosive methane gas (Doc. 33, Ex. 8 at ¶ 84) and OHM engineer Chris Nastally taking photographs of McBride using the cutting torch on the digester (Id. at ¶ 86).  According to these allegations, it may be said that the harms set forth in the underlying complaints would not have occurred but for both OHM's and Shmina's alleged failure to implement and observe reasonable safety precautions.

The question thus becomes whether these allegations set forth injuries caused by the acts or omissions of Shmina or by the independent acts or omissions of OHM. "Independent" is not defined by the Phoenix Policy, but its ordinary meaning is "[n]ot

subject to the control or influence of another; [n]ot associated with another entity; [n]ot dependent or contingent on something else." Black's Law Dictionary (8th ed. 2004). OHM contends that where both a named insured and a purported additional insured are alleged to have caused the same harm, the additional insured's actions cannot be "independent." In support of its position, OHM relies on <u>Peterson</u>, which involved a blanket additional insurance endorsement identical to the one at issue here. <u>See</u> 460 S.W.3d at 399. In that case, the Missouri Highway and Transportation Commission ("MHTC") had hired Progressive Contractors, Inc., ("PCI") to provide construction services for a bridge repair project. <u>Id.</u> at 397. After a car drove through a hole PCI had cut into the bridge, two plaintiffs sought damages for wrongful death and personal injuries against MHTC and PCI. <u>Id.</u> MHTC settled with the plaintiffs but later sought a declaration that PCI's insurer, Discover, owed MHTC a duty to defend as an additional insured. <u>Id.</u> at 399. The court ultimately found that Discover had not met its burden of establishing that the injuries and damages resulted from MHTC's independent acts or omissions, explaining:

> MHTC's separate acts or omissions, even if they existed, operated at best *in tandem* with the acts or omissions of PCI and HTI to cause Linda's and Janet's damages. In other words, there is no indication in the record that MHTC's purely "independent" acts or omissions caused the injuries and death, as the exclusion expressly requires.

<u>Id.</u> at 407.

Phoenix challenges OHM's reliance on <u>Peterson</u>, arguing that the court's holding was focused on the sufficiency of the record evidence, which was inadequate to support a finding of independent acts. Furthermore, Phoenix attempts to differentiate <u>Peterson</u> from the present case because the only allegations made against OHM are for its own

independent acts or omissions apart from any other defendant's conduct.  With respect to the first argument, the present case involves similar factual circumstances to Peterson.  Although a jury had already determined in the underlying case that PCI was not negligent, id. at 405, this fact had no bearing on the court's analysis relating to whether MHTC's acts or omissions were "independent" – the court looked to the allegations of the underlying complaints and not to the ultimate findings or outcome, id. at 407.  With respect to Phoenix's latter argument, it is simply wrong.  As discussed above, the majority of the pleadings allege the same breaches on the parts of both Shmina and OHM.  Therefore, Phoenix's attack on OHM's reliance on Peterson is unavailing.

Phoenix directs the Court's attention to B.L. England, which it argues is analogous to the present circumstances.  In that case, an employee of Industrial Process Solutions ("IPS") was injured while completing a job pursuant to a purchase order agreement between IPS and B.L. England.  2013 U.S. Dist. LEXIS 168715 at *2-3.  The injured employee subsequently filed a negligence action against B.L. England – for failure to maintain its premises, failure to comply with building codes, and failure to warn of dangerous conditions – but did not maintain an action against IPS.  Id. at *3.  Pursuant to the purchase order agreement, IPS had obtained a general liability insurance policy through Travelers containing an additional insured endorsement identical to the endorsement at issue here.  Id. at *4-5.  B.L. England sought coverage for the negligence suit as an additional insured; however, the court found:

> [T]he theory of liability in Shannon's complaint relates to negligent acts or omissions by B.L. England, and that the maintenance of the premises, including the strut pipe, related to "independent acts or omissions," as the maintenance was not subject to the control of any entity other than B.L.

> England and the other third-party plaintiffs. The Travelers policy
> unequivocally excludes coverage to an additional insured such as B.L.
> England for its own negligent acts and omissions.

Id. at *31.  However, B.L. England may be distinguished from the present case because whereas IPS was not named as a defendant in the underlying suit, Shmina is alleged to have breached the same duties as OHM.  Additionally, the implementation of safety precautions is not alleged to have been in the exclusive control of OHM.  B.L. England therefore is not comparable to the situation at hand.

Phoenix contends that there may be more than one proximate cause of an injury and that one defendant's negligence does not destroy the independence of another's. See Brisboy v. Fibreboard Corp., 429 Mich. 540, 547, n.3 (Mich. 1988) ("A cause may be proximate although it and another cause act at the same time or in combination to produce the occurrence.").  According to Phoenix, the underlying complaints allege liability against OHM in its unique capacity as the project engineer/architect.  Because OHM had its own individual duties and responsibilities, any breach of those duties must have resulted from its independent acts or omissions.  In support of this theory, Phoenix cites to United Construction Ent. Co. of St. Louis v. Amerisure, Inc., a case which involves the same policy language as that disputed in the present case.  See 2011 U.S. Dist. LEXIS at *11.  In that case, general contractor United Construction Ent. Co. ("United") subcontracted with Builder's Bloc to construct a staircase – Builder's Bloc was to provide the labor and equipment required to construct the staircase according to the design furnished by United.  Id. at *2.  Pursuant to the subcontract, Builder's Bloc obtained a commercial general liability policy from American Contractors Insurance Company Risk Retention Group ("ACIG") and named United as an additional insured.

15

After construction was complete, the staircase collapsed, injuring an individual who subsequently brought a negligence claim against Builder's Bloc.  Id. at *3.  Builder's Bloc settled the claim but initiated its own action against United, seeking contribution for United's share of liability.  Id.  United then filed a separate action seeking a declaratory judgment that ACIG owed it a duty to defend.  Id.  The court ultimately found that because the subcontract expressly stipulated that Builder's Bloc would not provide any design services as part of its work, it "effectively limited the scope of the definition of 'your work' under the CGL policy to exclude any design services."  Id. at *12.  Accordingly, to the extent that United was liable for its design services, these services constituted "independent acts" under the policy, and ACIG therefore had no duty to defend.  Id. at *13.

United Construction is distinguishable from the present case.  In United Construction, there was a bright line between United's duties for which is it was liable and Builder Bloc's duties for which it was liable.  Here, in contrast, responsibility for some of the harms alleged cannot be separated so cleanly.  Although OHM, and not Shmina, was responsible for designing the project, Shmina was apparently responsible for implementing and supervising jobsite safety precautions.  (See Doc. 33, Ex. 5.)  However, OHM expanded its responsibilities by providing an on-site project engineer to oversee and supervise Shmina's activities.  (Doc. 33, Exs. 4, 5, 6.)  Some of the claims in the underlying complaints allege acts or omissions undertaken by OHM that are derived from its independent responsibilities as project engineer, such as "failing to ensure the General Contractor and all subcontractors complied with all engineering plans and specifications."  (Doc. 33, Ex. 7 at¶ 53g.)  Other claims, however, are

16

asserted against both OHM and Shmina for breaches of many of the same duties, including oversight of jobsite safety.  For example, as discussed above, the McBride complaint alleges that both companies breached their duties of care by "failing to observe whether reasonable safety precautions were being exercised where Defendants OHM, A.Z. SHMINA and PLATINUM had an unusually high degree of control over the Project."  (Id. at ¶ 23a-b and ¶ 53a-b.)

Accordingly, it would appear that while *some* of the allegations in the underlying complaints are premised on independent acts or omissions by OHM, others arise from acts or omissions also associated with Shmina's work.  Because Shmina was undisputedly responsible for jobsite safety, and many of the allegations concern jobsite safety, the omissions alleged *arguably* can be said to arise, at least in part, from Shmina's work.  Because "an insurer has a duty to defend, despite theories of liability asserted against any insured which are not covered under the policy, if there are any theories of recovery that fall within the policy," Phoenix's "independent acts" defense does not eliminate its duty to defend.  See Radenbaugh, 240 Mich. App. at 137.

### 2.  Professional Services Exclusion

The Phoenix Policy's additional insured endorsement excludes from coverage liability for "'bodily injury', 'property damage' or 'personal injury' arising out of the rendering of, or failure to render, any professional architectural, engineering or surveying services, including . . . supervisory, inspection, architectural or engineering activities."  (Doc. 33, Ex. 9.)  In applying these types of provisions, courts have previously observed that the term "professional service" entails "something more than an act flowing from mere employment or vocation," and that "[t]he act or service must be

17

such as exacts the use or application of special learning or attainments of some kind." St. Paul Fire & Marine Ins. Co. v. Quintana, 165 Mich. App. 719, 723 (1988).  Further, when considering a professional services exclusion, courts must look not to the title or character of the party performing the act, but rather to the act or omission itself.  Am. Fellowship Mut. Ins. Co. v. Ins. Co. of N. Am., 90 Mich. App. 633, 638 (1979).

Overall, a review of Michigan cases reveals a broad interpretation of the term "professional services."  For example, a physician was denied liability coverage for claims alleging negligent failure to maintain and deliver records and messages regarding a patient's pathology report because these omissions were within the realm of "professional services."  White v. Auto-Owners Ins. Co., No. 265380, 2006 Mich. App. LEXIS 725 at *8 (Mich. Ct. App. March 16, 2006).  The Court of Appeals reasoned that although these services were technically administrative in nature, they were more aptly characterized as "improper follow-through after a medical procedure, which encompasses the failure to render a medical service."  Id. at *9-10.  Likewise, the Court of Appeals determined that the drilling of holes in a field by two unlicensed engineering technicians fell within the scope of "professional services."  Centennial Ins. Co. v. Neyer, Tiseo & Hindo, 207 Mich. App. 235, 239 (Mich. Ct. App. 1994).  In that case, the engineering consulting firm Neyer Tiseo had been retained to perform a soil investigation.  Id. at 236.  In the course of performing services, two Neyer Tiseo employees, both unlicensed engineers, conducted drilling without first calling "Miss Dig," a statutorily-mandated organization created to receive notice of proposed excavation. Id. at 237.  The drilling ultimately damaged a Michigan Bell cable, and Michigan Bell subsequently sent Neyer Tiseo a claim for damages.  Id.  Neyer Tiseo sought coverage

from its general liability insurer, maintaining that "the damage occurred during the drilling of holes in the field, not during the performance of professional services." Id. The Court of Appeals disagreed, holding that "[t]he decision in this case to drill for soil samples before calling 'Miss Dig' was preliminary to, and part of, the 'professional service' of conducting a soil investigation." Id. at 238-39.

In order to rebut these cases, OHM relies on St. Paul Fire & Marine Insurance Company v. Quintana, 165 Mich. App. 719 (Mich. Ct. App. 1988). In that case, the Michigan Court of Appeals determined that an EEG technician's sexual assault of a patient did not constitute a "professional service" under the insurance policy. Id. at 724. The court cited to language from another case that "[t]he scope of 'professional services' does not include all forms of a doctor's conduct simply because he is a doctor." Id. at 723 (quoting Hirst v. St. Paul Fire & Marine Insurance Co., 106 Idaho 792, 796 (Idaho 1984)). The Quintana decision was premised on the court's observation that the sexual assault "was not part of the EEG examination or even done under the guise of the examination." Id. at 724. Indeed, cases determining whether alleged conduct is properly classified as a "professional service" seem to analyze whether the conduct is reasonably related to the contracted-for service. See Erie Ins. Group v. Alliance Envtl., Inc., 921 F. Supp. 537, 547 (S.D. Ind. 1996) ("[T]he statements in dispute here, although not *expressly* called for, were made in the course of providing professional services to the school corporation, *were reasonably related to the services provided*, and involved the use of professional experience, skill, judgment, or knowledge." (emphasis added)). This principle proves to be a dependable indicator of the correct outcome in a given case. For example, sexual assault is clearly not

19

reasonably related to the performance of an EEG, while maintaining records and communications are reasonably related to providing medical care.  Applying this principle to the present case leads the Court to the conclusion that ensuring proper safety precautions on a construction site is reasonably related to engineering the design and overseeing the supervision of a project.

OHM contends that <u>White</u> and <u>Centennial</u> are distinguishable from the present factual circumstances.  Whereas those two cases involve services that were part and parcel of the insureds' contracted-for duties, the injuries alleged in the present underlying claims are attributable to construction means, methods, techniques, and safety, over which OHM had no authority.  That is, OHM's negligent acts and omissions alleged in the underlying actions categorically go beyond the scope of its contracted-for professional services.  OHM's argument, though cogent, seems to implicate the merits of the underlying claims.  The Court need not engage in an analysis of OHM's fault for the harms alleged in the underlying actions.  <u>See</u> <u>Walgreen Co. v. RDC Enters., L.L.C.</u>, No. 293608, 2011 Mich. App. LEXIS 1513 at *18 (Mich. Ct. App. Aug. 23, 2011) ("The matter before us does not require a sharpening of the issues being litigated in the Saffaleo negligence action, but only an assessment of their effect on insurance coverage.  Therefore, it is unnecessary to determine if there is evidence that Walgreen lacks fault for the ultimate design of the catwalk.").  The Court is to rely upon, and accept as true, the actions and omissions alleged in the underlying complaint.  Stated a different way, it is not the scope of an insured's contract that dictates what is or is not a professional service but rather the nature of the insured's acts or omissions that allegedly impose liability.

The case <u>Hilderbrandt v. Rumsey & Sons Construction</u> is directly on point.  <u>See</u>

No. 220340, 2001 Mich. App. LEXIS 1517 (Mich. Ct. App. June 5, 2001).  In that case,

the general contractor Rumsey & Sons Construction, Inc., ("Rumsey") hired Engineering

Technologies Corporation ("ETC") to design a water main project for the City of Howell,

assist in preparation of bidding documents, and monitor Rumsey for compliance with its

contract with Howell.  <u>Id.</u> at *2.  During the course of the project, Michael Hilderbrandt, a

Rumsey employee, was fatally injured on the jobsite when a water trench collapsed on

him.  <u>Id.</u> at *1.  Hilderbrandt's estate filed a wrongful death action against ETC, alleging

ETC's negligent failure to advise Rumsey of MIOSHA violations and failure to provide

adequate safety supervision.  <u>Id.</u> at *7.  ETC sought defense from Westfield Insurance

Company ("Westfield"), its commercial general liability insurer.  <u>Id.</u> at *2.  Although ETC

presented evidence indicating that, pursuant to the agreement, it had no responsibility

to inspect, provide safety supervision, or instruct the contractor on safety, the court

determined that the professional services exclusion applied, holding that "[a]ssuming

ETC had a duty to recognize and advise regarding such a violation, the failure to do so

involves a failure to render the professional inspection and supervision services

assumed under the contract.  The recognition of such a violation involves some

specialized knowledge and expertise . . . ."  <u>Id.</u> at *22.  The court thus found that

Westfield owed ETC no duty to defend.  <u>Id.</u>  In the present case, assuming that OHM

had a duty to ensure the implementation of proper safety precautions, these duties fall

within the scope of OHM's professional engineering services; in assessing potential

safety dangers, OHM would have been drawing on its professional experience, skill,

judgment, and knowledge.  Accordingly, OHM's liability falls into the professional

services exclusion to coverage, and Phoenix has no duty to defend.  The Court

therefore grants Phoenix's motion for summary judgment and denies OHM's motion for

summary judgment.

### 3.  Primary and Excess Insurance

Lastly, Phoenix argues that if OHM were to have been determined an additional

insured pursuant to the Phoenix Policy, the insurance provided would be excess, and

not primary, over "other insurance" available to OHM.  The terms of the Blanket

Additional Insured provision state:

> The insurance provided to the additional insured by this endorsement is
> excess over any valid and collectible "other insurance", whether primary,
> excess, contingent or on any other basis, that is available to the additional
> insured for a loss we cover under this endorsement. However, if the
> "written contract requiring insurance" specifically requires that this
> insurance apply on a primary basis or a primary and non-contributory
> basis, this insurance is primary to "other insurance" available to the
> additional insured which covers that person or organization as a named
> insured for such loss, and we will not share with that "other insurance".
> But the insurance provided to the additional insured by this endorsement
> still is excess over any valid and collectible "other insurance", whether
> primary, excess, contingent or on any other basis, that is available to the
> additional insured when that person or organization is an additional
> insured under such "other insurance".

(Doc. 33, Ex. 9.)

The plain meaning of this provision indicates that the additional insured

endorsement provides only excess coverage over any "other insurance," unless the

written contract requiring insurance "specifically requires that this insurance apply on a

primary basis."  As noted by the Western District of Michigan, the majority of

jurisdictions require that a written agreement explicitly state that an additional insured's

coverage will be primary before extending primary coverage to the additional insured.

Kummer Enters., Inc. v. Valley Forge Ins. Co., No. 1:09-cv-109, 2010 U.S. Dist. LEXIS

22

6403 at *21 (W.D. Mich. Jan. 27, 2010) ("This rule appears to be more appropriate than the *Pecker* rule because it gives effect to the plain terms of the insurance contract, which, in this case, permit Plaintiff primary insurance only if a writing 'specifically requires' it."). This Court agrees that this interpretation comports with the plain language of the contract, which requires that a contract "specifically require[]" that the additional insured endorsement extend primary coverage.

Here, there is no dispute that the Prime Contract does not explicitly require Shmina to obtain coverage for OHM on a primary or non-contributory basis. (See Doc. 33, Ex. 3, Section 00 80 00.) Further, there is no dispute that OHM's professional liability policy with XL Insurance qualifies as "other insurance." OHM's sole contention is that the XL Insurance policy provides coverage on an excess basis and is therefore irreconcilable with Phoenix's identical policy. See St. Paul Fire & Marine Ins. Co. v. Am. Home Assurance Co., 444 Mich. 560, 577 (Mich. 1994) ("We also acknowledge that it may be necessary to declare 'other insurance' clauses irreconcilable when the applicable portions of the two other insurance clauses are identical excess clauses."). OHM's position lacks merit, as the two policy provisions are not identical. The terms of the XL Insurance policy state, in pertinent part:

> This insurance shall be excess of the Deductible and any other valid and collectible insurance available to the INSURED, whether such other insurance is stated to be primary, pro rata, contributory, excess, contingent or otherwise, *unless such other insurance is written solely and specifically as excess insurance over this Policy.*

(Doc. 33, Ex. 15 (emphasis added).) Although the XL Insurance policy indicates that it is to be construed on an excess basis, it incorporates the qualifier "*unless* such other insurance is written solely and specifically as excess insurance over this Policy." As

determined above, the Phoenix Policy is clearly written in excess over the XL Insurance

policy.  Accordingly, the XL Insurance policy is not to be construed as an excess policy,

and these two policies are not irreconcilable.  Am. Home Assurance Co., 444 Mich. at

578 ("We do not view 'other insurance' clauses as being automatically irreconcilable and

choose not to adopt a rule that requires this Court to automatically override the

contractual language and, perhaps, the negotiated intent of the parties.").  Accordingly,

the Court agrees with Phoenix's position that even if OHM were to be found an

additional insured, the Phoenix Policy would provide only excess coverage.

### B.  The Federated Policy

#### 1.  Waiver/Estoppel

On February 19, 2014, Federated informed OHM by letter that it would not

accept OHM's tender of defense and indemnification.  (Doc. 32, Ex. 8.)  The denial

letter explained, "OHM is not an additional insured under Federated's policy of

insurance with Platinum Mechanical, Inc., (No. 9184957).  Specifically, the Additional

Insured by Contract Endorsement (CG-F-48) states that additional insured status under

the endorsement does not apply to [the performance of professional services]."  (Id.)

OHM argues that because the only reason cited by Federated in the denial letter is the

professional services exclusion, Federated is estopped from advancing any other

argument.  See Smith v. Grange Mut. Fire Ins. Co., 234 Mich. 119, 122-23 (Mich. 1926)

("[W]hen a loss under an insurance policy has occurred and payment refused for

reasons stated good faith requires that the company shall fully apprise the insured of all

of the defenses it intends to rely upon, and its failure to do so is, in legal effect, a waiver,

and estops it from maintaining any defenses to an action on the policy other than those of which it has thus given notice.").

The denial letter first states broadly that OHM is not an additional insured under the Federated Policy and then goes on to cite specifically to the professional services exclusion.  It is no stretch to interpret the letter as advancing both bases of defense asserted before the Court – that OHM is not an additional insured *and* that coverage is defeated by the professional services exclusion.  Further, OHM cannot, by waiver or estoppel, expand coverage under the policy to include OHM as an additional insured. "Michigan law provides that waiver and estoppel are unavailable to broaden coverage of a policy to protect the insured against risks that were not included in the policy or that were expressly excluded."  City of Warren v. Int'l Ins. Co. of Hannover, Ltd., 524 F. App'x 254, 260 (6th Cir. 2013).  OHM attempts to distinguish City of Warren by noting that the letter at issue in that case was not a formal denial of coverage.  Although that observation is accurate, the portion of the opinion relied upon by Federated assumes for the sake of argument that the insurer had failed to raise a particular exclusion in a formal denial letter.  Id. ("Even if Hannover had neglected to raise Exclusion 18.e in its formal denial letter . . . .").  Accordingly, Federated is not foreclosed from advancing all of its defenses.

### 2.  Additional Insured Endorsement

The Federated Policy includes the following Additional Insured By Contract Endorsement:

> Section II – Who Is An Insured is amended to include as an additional
> insured any person or organization, other than a joint venture, for whom

you are performing operations when you and such person or organization have agreed in writing in a contract or agreement that such person or organization be added as an additional insured on your policy. Such person or organization is an additional insured only with respect to liability for "bodily injury", "property damage", or "personal and advertising injury" caused, in whole or in part, by:

    1.      Your acts or omissions; or
    2.      The acts or omissions of those acting on your behalf;

in the performance of your ongoing operations for the additional insured.

(Doc. 32, Ex. 1.)  The first issue in dispute regarding this provision is whether there was a "writing in a contract or agreement" requiring that OHM be added as an additional insured.  OHM's position is that the Platinum Subcontract is such an agreement.  That contract required Platinum "to add A.Z. Shmina. Inc. the Owner, *and any additional parties as required by the Prime Contract Document*" to its commercial general liability policy as additional insureds.  (Doc. 32, Ex. 5 (emphasis added).)  Section 00 80 00 of the Prime Contract between Shmina and the Village of Dexter, in turn, required Shmina to "purchase and maintain during the term of the project such insurance as will protect him, the OWNER(s), and Orchard Hiltz & McCliment, Inc." from liability.  (Doc. 33, Ex. 3.)  Exhibit A to the Platinum Subcontract explicitly incorporates by reference Section 00 80 00.  (Doc. 32, Ex. 5.)  Essentially, OHM relies on a two-step analysis to bootstrap Shmina's obligation to insure OHM pursuant to the Prime Contract to Platinum's obligation to insure under the subcontract.  Meanwhile, Federated contends that OHM is not an additional insured under the policy because it had no direct contractual relationship with Platinum.  According to Federated, the Prime Contract imposes no obligations on Platinum, as it was executed between Shmina and the Village of Dexter.  The language regarding insurance imposes an obligation only on "the CONTRACTOR"

26

– that is, Shmina.  Platinum was not a signatory to the Prime Contract, and there is no language within the agreement requiring that Platinum – or subcontractors in general – to add OHM as an additional insured.

A similar dispute was presented in a highly analogous yet factually distinguishable case decided in the District of Connecticut, where the court determined that an additional insured endorsement does not require privity of contract in order to provide coverage.  First Mercury Ins. Co. v. Shawmut Woodworking & Supply, Inc., 48 F.Supp. 3d 158, 166 (D. Conn. 2014).  In that case, Shawmut Woodworking & Supply, Inc., ("Shawmut"), the general contractor and designer for a project, subcontracted with Shepard Steel Company ("Shepard") for steel fabrication and construction.  Id. at 160. Shepard, in turn, sub-subcontracted with Fast Trek Steel ("Fast Trek") for erection work. Id.  As required by its agreement with Shepard, Fast Trek obtained a general liability policy from First Mercury Insurance Company ("First Mercury").  Id.  After a Fast Trek employee was killed, the estate filed negligence suits against Shepard and Shawmut, both of whom demanded that First Mercury defend and indemnify them as additional insureds.  Id.  Although there was no dispute that Shepard was an additional insured, Shawmut had not contracted directly with Fast Trek.  Id. at 164.  However, Shawmut's Contract Documents with Shepard required Shepard to obtain liability insurance naming Shawmut as an additional insured and further requiring that Shepard's subcontractors also be bound by the Contract Documents.  Id.  Accordingly, the contract between Shepard and Fast Trek required that Fast Trek name Shawmut as an additional insured. Id.  Thus, because both Shawmut and Fast Trek had separately agreed that Fast Trek would name Shawmut as an additional insured, "both parties' agreement[s] could be

27

memorialized in separate contracts without requiring a direct contractual relationship . . . ." Id. at 166-67.

Shawmut is ultimately distinguishable from the present case.  Certainly, there is good reason to find that the lack of a direct agreement between Platinum and OHM does not necessarily preclude the possibility that OHM could be an additional insured.  However, whereas Fast Trek agreed in the subcontract to provide coverage for Shawmut as an additional insured, and Shepard agreed that it would require its subcontractors to insure Shawmut, neither factor is present in the instant case.  The Prime Contract required only that the contractor, Shmina, obtain liability insurance protecting itself, Village of Dexter, and OHM from claims arising out of Shmina's work or the work of its subcontractors.  It is silent with respect to the need for subcontractors to obtain liability insurance.  Likewise, the Platinum Subcontract required Platinum to obtain a liability policy protecting itself, Shmina, and the Village of Dexter, and "any additional parties as required by the Prime Contract Document."  However, the Prime Document did not require subcontractors to obtain liability insurance.  Accordingly, the Court does not read these provisions as extending liability coverage to OHM as an additional insured.   Indeed, it is the burden of the party claiming to be insured that its claim falls within the terms of the policy.  OHM has not met that burden here.

### 3.  Professional Services Exclusion

Even if the Court were to determine that OHM was an additional insured pursuant to the Platinum Subcontract and the Prime Contract, coverage would be

negated pursuant to the professional services exclusion. The Federated Policy's

additional insured endorsement contains the following exclusion to coverage:

> Any person or organization whose profession, business or occupation is
> that of an architect, surveyor or engineer with respect to liability arising out
> of the preparation or approval of or the failure in preparation or approval of
> maps, shop drawings, opinions, reports, surveys . . . or the performance of
> any other professional services by such person or organization.

(Doc. 30, Ex. 8.)  Though worded slightly differently, this provision is, in essence, the

same as the professional services exclusion contained in the Phoenix Policy discussed

above.  The parties raise the same arguments with respect to the Federated Policy's

professional services exclusion as the Court discussed above with respect to the

Phoenix Policy exclusion.  To the extent that OHM raises the new argument that the

exclusion applies only "with respect to liability" in the underlying actions and that liability

has not yet been determined, its reasoning is flawed.  A determination of liability is not

necessary in order for a court to decide the scope of coverage.  See Walgreen, 2011

Mich. App. LEXIS 1513 at *18 ("Therefore, it is unnecessary to determine if there is

evidence that Walgreen lacks fault for the ultimate design of the catwalk.").  Moreover,

such an interpretation is inconsistent with OHM's position that the Court may determine

it is an additional insured, as that provision also stipulates, "[s]uch person or

organization is an additional insured only with respect to liability . . . ."  (Id. (emphasis

added).)  Therefore, the Court's analysis and conclusions reached regarding the

professional services exclusion in the Phoenix Policy apply with equal force here.

Because OHM was indeed providing professional services during the course of the

incident, the Federated Policy's professional services exclusion applies, and Federated

has no obligation to defend.

**IV.      CONCLUSION**

For the foregoing reasons, the Court **GRANTS** Phoenix Insurance Company's Motion for Summary Judgment; **DENIES** Orchard Hiltz's Motion for Summary Judgment against Phoenix Insurance Company; **GRANTS** Federated Mutual Insurance Company's Motion for Summary Judgment; and **DENIES** Orchard Hiltz's Motion for Summary Judgment against Federated Mutual Insurance Company.

**IT IS SO ORDERED.**

Date:   November 19, 2015                           s/Marianne O. Battani
                                                                    MARIANNE O. BATTANI
                                                                    United States District Judge


<u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing Order was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail to the non-ECF participants on November 19, 2015.

                                                                    s/ Kay Doaks
                                                                    Case Manager